## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF KANSAS

**TAMMY LYNN FRY, as**
**Special Administrator of the**
**Estate of Timothy Michael Fry,**
**deceased; and TAMMY LYNN FRY,**
**as an Heir at Law of Timothy Michael**
**Fry, Deceased,**

                    **Plaintiff,**

**v.**                                            **Case No. 05-2248-JWL**

**CITY OF GALENA, KANSAS, et al.,**

          **Defendants.**

## MEMORANDUM AND ORDER

Plaintiff Tammy Lynn Fry brings this action, in her capacity as administrator of the Estate of Timothy Michael Fry, and in her capacity as the widow and thus heir at law of Timothy Michael Fry, pursuant to the Civil Rights Act of 1871, 42 U.S.C. § 1983; and the Kansas Wrongful Death Act, K.S.A. § 60-1901 et seq.  As a result of the shooting death of Timothy Michael Fry, Ms. Fry seeks compensatory and punitive damages from defendants City of Galena, Kansas (the "City"), Police Chief Gary Abram, Officer Steven Norman and Cherokee County Deputy Chris Corbit.

**I.      Factual Background**

The following facts are taken from the summary judgment record and are either uncontroverted or viewed in the light most favorable to Ms. Fry.

At approximately 4:30 a.m. on September 18, 2004, Galena Police Officer Chris Hardison responded to a dispatch report of a man swinging a baseball bat at a newspaper delivery person for the *Joplin Globe*.  Officer Hardison encountered Mr. Fry close to the Fry residence at 401 Washington Street.  Mr. Fry started running at Officer Hardison's car, yelling and swinging a baseball bat.  Officer Hardison put distance between himself and Mr. Fry, called for backup, exited the car, drew his handgun, pointed it at Mr. Fry, and instructed him to put the bat down.  Mr. Fry refused.  Officer Hardison ordered him to drop the bat again and Mr. Fry responded: "I'm going to split your fucking head open."  Mr. Fry then walked towards his house and Officer Hardison followed him, repeating his order to drop the bat.  Mr. Fry continued telling Officer Hardison he was going to split his head open.  Mr. Fry jumped over the fence and sat in his yard. The commotion woke Mr. Fry's wife, Ms. Fry, who came out and told Mr. Fry to go inside.  Ms. Fry also told Officer Hardison to leave and informed him that she had two young daughters in the house.  Mr. Fry went inside the house and Officer Hardison refused to leave.

Meanwhile, backup from Galena Police Department and Cherokee County Sheriff's Office arrived.  The officers positioned their cars so that the lights illuminated the house.  Galena Police Chief Gary Abram was also called and asked to come to the scene.  The officers continued to ask that Mr. Fry exit the house and that Ms. Fry bring her children out for their safety.  Ms. Fry said her husband was sleeping, she wouldn't wake him, and requested to speak with Chief Abram.  Chief Abram arrived at approximately 5:03 a.m. and was briefed by Officer Hardison on the situation. Chief Abram spoke with Ms. Fry and tried to calm her, telling her that

Mr. Fry needed to come outside and go to jail.  Chief Abram continued to communicate with Mr. Fry through Ms. Fry, trying to persuade him to exit the house but Mr. Fry refused.  Chief Abram then asked if Mr. Fry would talk to him on the phone, and Ms. Fry said he would.  Chief Abram went to the police station and attempted to telephone Mr. Fry without receiving an answer.  A neighbor, Walter Bradshaw, approached and asked to enter and speak with Mr. Fry.  Chief Abram refused, determining that he should not allow someone into a position to become a hostage.  Ms. Fry then agreed to bring her two daughters out of the house and they were taken to a neighbor's.  Chief Abram then made two more attempts to talk to Mr. Fry, once from the front porch and then from the back yard.  Mr. Fry responded "Fuck you, Gary Abram.  You don't mean jack shit to me."  Chief Abram stated in his deposition that he then heard Mr. Fry talk about Jesus Christ coming down and the wrath of the devil being upon us.

Deputy Chris Corbit arrived at the residence around 5:55 a.m. and was informed of the events.  Shortly after Deputy Corbit arrived, he heard Mr. Fry screaming and cursing.  Officer Doug Holbert, who was on the scene, stated in his affidavit that glass was broken by Mr. Fry from a back window and that Mr. Fry said he was hurt and would let someone in to help him.  Officer Hardison stated in his affidavit that he heard Mr. Fry yelling that he was hurt.  Chief Abram stated in his deposition that he heard Mr. Fry yell "I need help, need medical attention" and that he believed there was a need to get into the house to give Mr. Fry medical assistance.  Chief Abram also stated that he heard Ms. Fry yell, "[Mr. Fry] cut himself and is bleeding badly.  He needs medical attention."

3

In Ms. Fry's deposition, she stated that she heard glass break in the back, so she went to the back yard.  Ms. Fry stated that the officers told her to go back to the front of the house, but that she hid by a woodpile in the backyard instead because she thought her husband was hurt.  Ms. Fry stated she heard Mr. Fry say he wanted peace, but she didn't hear him ask for help or say that he was cut.  KBI Agent Ronnie Light stated that after the incident concluded, he took a statement from Ms. Fry in which she said she heard glass break and heard Mr. Fry say he was cut and bleeding.  Ms. Fry testified in her deposition that she has no current recollection  of making this statement to Agent Light; nor did she remember knowing Mr. Fry had been cut.

Officer Steve Norman arrived at the scene at approximately 6:24 a.m. and was informed of the events.  The police dispatch log shows a report of glass breaking at 6:16 a.m. and a report at 6:24 a.m. that officers were about to make entry.  Chief Abram gave the order to enter the residence; he felt the officers needed to get in the house to administer medical assistance to Mr. Fry.  Officer Norman, Deputy Corbit and Officer Holbert entered through the front door; they were joined by Officer Hardison and Assistant Chief of Police Keith Marshall.

The officers entered with their weapons drawn and "cleared" the house.  Then they moved towards a doorway to another room, announced their presence and called out to Mr. Fry but he did not respond.  The door was off its hinges, so the officers pulled it away and found a propped up mattress with Mr. Fry behind it, holding a hunting knife.  Officer Norman saw a lot of blood on Mr. Fry's arm and thought Mr. Fry had a "pretty serious injury."  When the officers first encountered Mr. Fry, Deputy Corbit heard him say "Jesus Christ, cast these demons out of my

4

home" and "you're not going to take me."  Officer Holbert heard Mr. Fry say "he would kill us all if we didn't leave."

The officers then repeatedly asked Mr. Fry to set the knife down but he refused.  Officer Norman sprayed Fry's face with mace; which he said appeared to have very little effect on Mr. Fry.  The officers continued ordering Mr. Fry to drop the knife but he again refused.  Chief Abram then came into the house and tried to talk to Mr. Fry.  Chief Abram heard Mr. Fry say "I will kill you bastards" and "[t]he first man to come through, I will stab."  Officer Norman sprayed Mr. Fry with mace a second time but he said it again appeared to have little effect.  Mr. Fry then pushed the mattress at the officers and ran back through a bedroom and into a bathroom and slammed the door behind him.  At this time Chief Abram exited the residence, but did not have his officers pull back because he was concerned that Mr. Fry would hurt himself.

The officers discussed what to do; they did not know what was behind the door and they did not know whether Mr. Fry was contained.  The officers developed a plan to kick down the door and pin Mr. Fry underneath it so they could subdue him.  Deputy Corbit kicked the door and it came down on the third try.  Mr. Fry stood up with the knife in his hand and Officer Hardison saw that Mr. Fry's left forearm was bleeding.  Officer Norman recalled that Mr. Fry was "covered in blood."  The officers again repeatedly asked Mr. Fry to drop the knife but he refused.  Mr. Fry stated "you're not going to take me" and "I will kill anyone that comes near me." Deputy Corbit estimates that Mr. Fry was seven or eight feet away from the officers at this point.  Then Mr. Fry raised the knife to eye level and lunged toward Deputy Corbit with the

knife, ending up approximately 1½ feet from Deputy Corbit's throat. Deputy Corbit attempted to retreat but his feet hit a wall and he thought he could back up no further. Deputy Corbit discharged his weapon because he felt his life was in imminent danger. Officer Norman also discharged his weapon at Mr. Fry, believing Deputy Corbit was in mortal danger. Mr. Fry immediately hit the ground and was pronounced dead shortly thereafter. Mr. Fry died as a result of injuries received from gunshots fired by Officer Norman and/or Deputy Corbit.

## II.   Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Lifewise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004). An issue is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003)(citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, (1986)). A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim." *Id*. (citing *Anderson*, 477 U.S. at 248).

The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Id*. (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, (1986)). In attempting to meet that standard, a movant that does

not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim. *Id.* (citing *Celotex*, 477 U.S. at 325).

If the movant carries this initial burden, the nonmovant that would bear the burden of persuasion at trial may not simply rest upon its pleadings; the burden shifts to the nonmovant to go beyond the pleadings and "set forth specific facts" that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant. *Id.* (citing Fed. R. Civ. P. 56(e)).  To accomplish this, sufficient evidence pertinent to the material issue "must be identified by reference to an affidavit, a deposition transcript, or a specific exhibit incorporated therein." *Diaz v. Paul J. Kennedy Law Firm*, 289 F.3d 671, 675 (10th Cir. 2002). Finally, the court notes that summary judgment is not a "disfavored procedural shortcut;" rather, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action." *Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

## III.    Discussion

*A.    Claims Against Deputy Corbit and Officer Norman*

Ms. Fry, in her capacity as administrator of Thomas Michael Fry's estate, claims that defendants Deputy Corbit and Officer Norman deprived Mr. Fry of his Fourth Amendment right to be free from unreasonable seizure by using force that was objectively unreasonable in light of the facts and circumstances confronting them.  Ms. Fry also contends that this excessive force resulted in a violation of bodily integrity that "shocks the conscience" and thus deprived Mr. Fry

of his Fourteenth Amendment substantive due process rights.  Specifically, Ms. Fry alleges in the final pretrial order that defendants used excessive, lethal force against Mr. Fry; failed to call for support from mental health professionals or others trained in dealing with persons who may be experiencing a mental disorder; deliberately escalated the situation with Mr. Fry; and made no effort to de-escalate the situation.  Defendants Deputy Corbit and Officer Norman respond that they are entitled to qualified immunity because the force used was objectively reasonable and it would not have been clear to a reasonable officer in their positions that the force used was unlawful.

1.    Qualified Immunity

Under certain circumstances, the affirmative defense of qualified immunity shields public officials from individual liability in actions brought under 42 U.S.C. § 1983. *Harlow v. Fitzgerald*, 457 U.S. 800 (1982).  Qualified immunity "protects all but the plainly incompetent or those who knowingly violate the law."  *Holland ex rel. Overdorff v. Harrington*, 268 F.3d 1179, 1185 (10th Cir.2001).  Once a defendant asserts the qualified immunity defense, the plaintiff must then satisfy a "heavy two-part burden." *Albright v. Rodriguez*, 51 F.3d 1531, 1534 (10th Cir. 1995).  First, the plaintiff must demonstrate that the defendant's actions violated a specific constitutional right.  *Jiron v. City of Lakewood*, 392 F.3d 410, 414 (10th Cir. 2004)(citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  If a plaintiff fails to meet the threshold burden of demonstrating a constitutional violation, "there is no necessity for further inquiries concerning qualified immunity." *Saucier*, 533 U.S. at 201.  If, on the other hand, a plaintiff's

factual allegations amount to a violation of a constitutional right, "the next, sequential step is to ask whether the right was clearly established at the time of the defendant's unlawful conduct such that a reasonable person in the defendant's position would have known that the alleged conduct violated the federal right." *Id*. If the plaintiff fails to meet either of the two parts, the defendant is entitled to qualified immunity. *Albright*, 51 F.3d at 1534. Thus, a defendant is entitled to qualified immunity if the plaintiff fails to show a violation of a constitutional right at all or if the plaintiff fails to show the law was clearly established. *Id*.

Because Deputy Corbit and Officer Norman raise the qualified immunity defense, Ms. Fry must meet the "heavy two-part burden" of the qualified immunity test. First, the court must determine whether Deputy Corbit and Officer Norman's use of force violated Mr. Fry's constitutional rights. Ms. Fry claims the defendants violated Mr. Fry's Fourth Amendment and Fourteenth Amendment rights by using excessive force. The Supreme Court has made clear that excessive force claims are evaluated under the Fourth Amendment standard of reasonableness, rather than the Fourteenth Amendment substantive due process standard. *Graham v. Connor*, 490 U.S. 386, **395 (1989). Therefore, the court evaluates the excessive force claim under the Fourth Amendment objective reasonableness standard only, not the Fourteenth Amendment due process standard.** *See Jiron*, **392 F.3d at 414 (where a plaintiff alleges excessive force in violation of Fourth and Fourteenth Amendment, the claim is evaluated under Fourth Amendment standard of objective reasonableness).**

2.      **Excessive Force**

9

As mentioned above, a plaintiff's § 1983 claim that law enforcement officers "used excessive force–deadly or not–in the course of an arrest . . . or other 'seizure' of a free citizen" is evaluated under the Fourth Amendment's reasonableness standard. *Graham v. Connor*, 490 U.S. 386, 395 (1989). This requires a determination of "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id*. at 397. The factors to be considered include: severity of the crime at issue, whether the suspect poses an immediate threat to the safety of officers or others, and whether the suspect is actively resisting arrest or attempting to evade arrest by flight. *Jiron*, 392 F.3d at 415 (citing *Graham*, 490 U.S. at 396). "'Because police officers are often forced to make split-second judgments–in circumstances that are tense, uncertain, and rapidly evolving–about the amount of force that is necessary in a particular situation, the reasonableness of the officer's belief as to the appropriate level of force should be judged from that on-scene perspective.'" *Jiron*, 392 F.3d at 414 (quoting *Saucier*, 533 U.S. at 205). Using the "20/20 vision of hindsight" is prohibited. *Id*. Furthermore, officers are not required to use alternative, less intrusive means if their conduct is objectively reasonable. *Medina v. Cram*, 252 F.3d 1124, 1133 (10th Cir. 2001).

"An officer's use of deadly force in self-defense is not constitutionally unreasonable." *Romero v. Bd. of County Comm'rs*, 60 F.3d 702, 704 (10th Cir.1995) (citing *Tennessee v. Garner*, 471 U.S. 1, 11 (1985)). Deadly force is justifiable under the Fourth Amendment "if a reasonable officer . . . would have had probable cause to believe that there was a threat of serious physical harm to themselves or to others." *Sevier v. City of Lawrence*, 60 F.3d 695, 699 (10th

Cir.1995) (citing *Graham*, 490 U.S. at 396; *Garner*, 471 U.S. at 11).

Ms. Fry argues that the defendants' actions leading up to the shooting render the ultimate force that was used excessive and in violation of Mr. Fry's constitutional rights. "The reasonableness of the use of force depends not only on whether the officers were in danger at the precise moment that they used force, but also on whether the officers' own 'reckless or deliberate conduct during the seizure unreasonably created the need to use such force.'" *Jiron v. City of Lakewood*, 392 F.3d 410, 414 (10th Cir.2004) (quoting *Sevier*, 60 F.3d at 699). Thus, a court's inquiry includes "not only the officers' actions at the moment that the threat was presented, but also may include their actions in the moments leading up to the suspect's threat of force." *Allen v. Muskogee*, 119 F.3d 837, 840 (10th Cir.1997) (citing *Sevier*, 60 F.3d at 699); *see also Jiron*, 392 F.3d at 415 (citation omitted) (stating that "'mere negligent actions precipitating a confrontation . . . are not actionable under § 1983'"); *Romero*, 60 F.3d at 705 n.5 (recognizing that officers' "conduct prior to the suspect's threat of force may be relevant to the reasonableness inquiry if the conduct is 'immediately connected' to the suspect's threat of force").

In *Medina v. Cram*, the Tenth Circuit emphasized that "to constitute excessive force, the conduct arguably creating the need for force must be immediately connected with the seizure and must rise to the level of recklessness, rather than negligence. The primary focus of our inquiry, therefore, remains on whether the officer was in danger at the exact moment of the threat of force." 252 F.3d at 1132. In this case, Ms. Fry argues that the defendants unreasonably

11

escalated the situation, thus forcing Mr. Fry to take the actions which ultimately led to his death. Ms. Fry relies on her expert's report in arguing that defendants' actions of surrounding the house, shining bright lights into the house, failing to utilize a neutral communicator, entering the house, failing to use additional non-lethal methods, and the overall continued escalation of the situation were all objectively unreasonable and thus constituted excessive force on the part of the defendants. The court addresses each argument in turn.

a.      Events Occurring Prior to Entry

Surrounding the house, shining bright lights, and failing to utilize a neutral communicator are all events that occurred well before the final confrontation between Mr. Fry and Officers Corbit and Norman. In *Medina*, the Tenth Circuit emphasized that the primary focus is whether "the officer was in danger at the exact moment of the threat of force." 252 F.3d at 1132. Because these events occurred during the one and a half hour timespan prior to Mr. Fry's threat of force, the court concludes that they are not "immediately connected" in this situation and thus must rise to the level of recklessness to constitute excessive force. *Id*.

With regard to these actions, Ms. Fry does not cite to, nor has the court located, any case law indicating that such actions are objectively unreasonable, much less reckless, under these circumstances. Ms. Fry relies on her expert's report and argues that by engaging in these acts, the defendants escalated the situation rather than de-escalated it. She argues that if they had not illuminated the house and had called in a neutral communicator, the outcome may have been different. Her expert's opinion as to the existence of other reasonable methods to handle the

situation does not create a genuine issue of material fact sufficient to overcome summary judgment in this situation. *See Medina*, 252 F.3d at 1133 (the reasonableness standard does not require that officers use "alternative 'less intrusive' means")(citations omitted). *See also Tanberg v. Sholtis*, 401 F.3d 1151, 1162 (10th Cir. 2005)(citing *Graham*, 490 U.S. at 396-97)(stating that excessive force inquiry requires that officer use reasonable, not optimal, force).

Defendants argue that surrounding the house and shining the lights was necessary in order to keep Mr. Fry contained and to observe the house to ensure Ms. Fry and her children were safe. As for the failure to utilize a neutral communicator, Chief Abram attempted to communicate with Mr. Fry himself, both at the scene and via telephone, but his attempts proved useless. He argues that he did not bring in a third party communicator in order to avoid risk of injury to that person. In light of these circumstances, the court finds that these actions do not rise to the level of recklessness. Therefore, with respect to the actions leading up to the entry into the house, Ms. Fry has failed to establish that defendants acted recklessly and likewise has failed to establish the Fourth Amendment constitutional violation necessary to overcome defendants' claim of qualified immunity.

b.      Entering the House

Because entry into the house directly preceded the threat of force by Mr. Fry, the court concludes it is "immediately connected" and therefore evaluates it based on the *Graham* objective reasonableness standard. *See Allen v. Muskogee*, 119 F.3d 837, 841 (10th Cir. 1997) (finding events occurring ninety seconds prior to the time of the shooting "immediately

13

connected" to the threat of force).  Ms. Fry argues that a genuine issue of material fact exists as to whether Mr. Fry had cut himself or called for help and therefore entering the house was objectively unreasonable.  Defendants claim that because they reasonably believed Mr. Fry had injured himself by breaking the window and was bleeding, they were justified in entering the Fry residence under the exigent circumstances exception to the warrant requirement, recently explained in *Brigham City v. Stuart*, 126  S. Ct. 1943 (2006).

In *Brigham City*, the Supreme Court held that law enforcement officers may enter a home without a warrant when they have an objectively reasonable basis for believing that entry is necessary to render emergency assistance to an injured occupant or to protect an occupant from imminent injury.  *Id.*; *see also U.S. v. Najar*, 451 F.3d 710 (10th Cir. 2006).  The Supreme Court emphasized that this determination is based on the objectively reasonable standard and "the officer's subjective motivation is irrelevant."  *Brigham City*, 126 S.Ct. at 1945.

Chief Abram stated in his deposition that he heard Mr. Fry yell "I need help, need medical attention" and that he believed Fry was seriously injured.  He also stated he heard Ms. Fry screaming that Mr. Fry needed medical help because he was bleeding badly. Officer Holbert also stated in his affidavit that Mr. Fry broke a back window, said he was hurt and would let someone in to help him.  Officer Hardison stated in his affidavit that he heard Mr. Fry yelling he was hurt. If the court accepts the defendants' portrayal of the events, it would conclude that the entry into the house was objectively reasonable under the circumstances, particularly in light of the recent *Brigham City* decision.  However, the real issue is whether defendants' actions were objectively

14

reasonable in light of Ms. Fry's statements about the early morning of September 18, 2004, i.e., whether her deposition is sufficient to raise a genuine issue of material fact. In her deposition, Ms. Fry stated that she did not hear Mr. Fry say that he needed help. She also stated that she did not remember telling KBI Agent Light that she heard glass break and heard Mr. Fry say he was cut and bleeding. However, Ms. Fry did state that she thought Mr. Fry had been hurt when she heard the glass break. Moreover, she did not controvert Chief Abram's testimony that he heard her scream that Mr. Fry needed medical help.[1]

In order for her excessive force claim to survive the asserted defense of qualified immunity, Ms. Fry must show that the defendants did not have a reasonable basis for believing Mr. Fry needed medical assistance. *See Brigham City*, 126 S. Ct. at 1947. The court concludes she has failed to do this. Ms. Fry's deposition testimony is merely that she did not hear Mr. Fry call for help or say he was cut and bleeding. In light of Chief Abrams', Officer Holbert's and Officer Hardison's statements that they heard Mr. Fry call for help, that Ms. Fry screamed that Mr. Fry needed help, and Ms. Fry's statement to Agent Light that Mr. Fry called for help, the court concludes that even viewed in the light most favorable to Ms. Fry,  her deposition

---

[1] Local Rule 56.1(b) requires that a memorandum in opposition to a motion for summary judgment "refer with particularity to those portions of the record upon which the opposing party relies" when disputing a fact. Although Ms. Fry purports to controvert Chief Abram's testimony, she does so by merely referring to her deposition, where she testified she did not hear Mr. Fry state he needed medical help.   Nowhere in Ms. Fry's deposition does she dispute Chief Abram's statement that he heard Ms. Fry say Mr. Fry was cut, bleeding, and needed help, a conclusion she could have drawn and given voice to based on her admitted thought that Mr. Fry had hurt himself when she heard the glass break regardless of whether she heard Mr. Fry call for help.  Therefore, she has failed to controvert this statement.

testimony does not raise a genuine issue of material fact.  Consequently, the court finds that the defendants had an objectively reasonable basis for believing that Fry had cut himself and was in need of medical attention.  Thus, they were justified in entering the house under the exigent circumstances exception to the warrant requirement and such action did not constitute excessive force.  Therefore, Ms. Fry has failed to establish any violation of Mr. Fry's constitutional rights associated with the entry into the home.

c.      Failure to Use Additional Non-Lethal Methods

Ms. Fry, again relying upon her expert's report, alleges that the defendants' failure to use additional non-lethal methods in addition to the mace once they encountered Mr. Fry in the house constituted excessive force.  In *Medina*, the Tenth Circuit explicitly rejected the idea of considering an expert's opinion regarding the use of "pepper spray and other tactical measures," stating that to do so would be evaluating the conduct from the "20/20 perspective of hindsight rather than from the perspective of an officer making split-second judgments on the scene." *Medina*, 252 F.3d at 1133.  Accordingly, viewing the conduct from the perspective of an officer on the scene, it was not objectively unreasonable under the circumstances to fail to resort to other non-lethal measures after the use of mace proved ineffective.

d.      Mr. Fry's Threat of Force

Once they entered the house, the defendants identified themselves and urged Mr. Fry to come out.  When they encountered Mr. Fry, he was holding a hunting knife and said he would kill them all if they didn't leave.  The defendants followed Mr. Fry to the bathroom, where he

16

had barricaded himself, and again pleaded with him to surrender. They broke down the bathroom door, which was reasonable under the circumstances, because they did not know whether Mr. Fry was contained. *See Jiron*, 392 F.3d at 418 (holding that officer acted reasonably in taking steps to prevent an armed and agitated suspect from escaping by following a knife-wielding suspect into a bedroom rather than waiting for backup). Furthermore, defendants' actions were reasonable because they believed Mr. Fry was seriously injured and may have inflicted further injury upon himself. *See Brigham City*, 126 S. Ct. at 1947; *see also U.S. v. Najar*, 451 F.3d at 714. After defendants followed him to the bathroom, Mr. Fry lunged at Deputy Corbit with a knife. Ms. Fry does not dispute the fact that defendants' shooting of Mr. Fry when he lunged at Deputy Corbit with a knife was objectively reasonable under the circumstances. Ms. Fry puts forth no evidence which raises a genuine issue of material fact as to these actions, and therefore fails to establish that the defendants' conduct constituted excessive force. Accordingly, she has failed to establish that defendants violated any constitutional right once they responded to Mr. Fry's threat of force.

The events that took place on September 18, 2004, though tragic, do not rise to the level of a constitutional violation. In light of the facts and circumstances confronting the officers, the court finds the situation in this case clearly distinguishable from *Sevier* and *Allen*, where courts denied defendants' motions for summary judgment on § 1983 excessive force claims. In *Sevier*, there was no indication that Mr. Sevier had committed a crime. 60 F.3d 695 (10th Cir. 1995). Additionally, there were conflicting accounts regarding Mr. Sevier's actions which would allow

a reasonable trier of fact to conclude that Mr. Sevier did not threaten the officers with deadly force. *Id*. at 701. *Sevier* is unlike the facts in this case, where it is undisputed that Mr. Fry committed aggravated assault and that he lunged at Deputy Corbit with a knife. In *Allen*, there was conflicting testimony as to whether officers cautiously approached a suicidal Mr. Allen in his car or whether they ran screaming and shouting up to the car. 119 F.3d 837, 841 (10th Cir. 1997). The Tenth Circuit concluded that this discrepancy presented a genuine issue of material fact and therefore denied the defendants' motion for summary judgment. *Id*. There is no such conflict in the record here, and accordingly no genuine issue of material fact that would justify denying the defendants' summary judgment.

After examining the various depositions, affidavits and reports contained in the record, the court concludes that Ms. Fry has failed to satisfy her burden with respect to the first prong of the qualified immunity test. She has raised no genuine issue of material fact regarding the objective reasonableness of defendants' alleged use of excessive force, and thus has failed to establish a constitutional violation. Because the court concludes Ms. Fry has failed to put forth evidence showing a constitutional violation, it need not address the second prong of qualified immunity. Accordingly, the court finds that Deputy Corbit and Officer Norman are entitled to qualified immunity.

B.    *Remaining Claims Against Chief Abram and the City*

Ms. Fry also seeks to impose § 1983 liability against Chief Abram for a failure to supervise and against the City for failure to instruct, train, supervise, and control. An essential

element of these claims is an underlying constitutional violation.  *See Brown v. Gray*, 227 F.3d 1278 (10th Cir. 2000)(claim against municipality for failure to train requires constitutional deprivation by officers); *Green v. Branson*, 108 F.3d 1296 (10th Cir. 1997)(supervisor liability under § 1983 requires constitutional deprivation).  Accordingly, the court's conclusion that defendants Deputy Corbit and Officer Norman did not use excessive force in violation of the Fourth Amendment prevents a § 1983 claim against these remaining defendants.  *See Jiron,* 392 F.3d at 419 & n.8 (dismissing § 1983 claims against chief of police, police department, and city after concluding that the acting officer's conduct was objectively reasonable).

C.    *State Law Claims*

       Ms. Fry asserts a wrongful death claim premised on either battery or negligence under Kansas state law.  Defendants' motions for summary judgment argue that Ms. Fry's wrongful death claim based on battery must fail because defendants were legally privileged to use deadly force under Kansas law, specifically K.S.A. § 21-3215(1).  Defendants argue that Ms. Fry's wrongful death claim based on negligence must fail because they were entitled to immunity pursuant to the various exceptions to the Kansas Tort Claims Act, K.S.A.§ 75-6104.

1.    Wrongful Death Premised on Battery

       K.S.A. § 21-3215(1) authorizes law enforcement officers to use deadly force.  The statute states:

> A law enforcement officer . . . need not retreat or desist from efforts to make a lawful arrest because of resistance or threatened resistance to the arrest. Such officer is justified in the use of any force which such officer reasonably believes

> to be necessary to effect the arrest and of any force which such officer reasonably believes to be necessary to defend the officer's self or another from bodily harm while making the arrest. However, such officer is justified in using force likely to cause death or great bodily harm only when such officer reasonably believes that such force is necessary to prevent death or great bodily harm to such officer or another person . . . .

K.S.A. § 21-3215(1).

This statute applies to officers' criminal liability, but the Kansas Supreme Court has applied it equally to civil liability. *See Dauffenbach v. City of Wichita*, 233 Kan. 1028, 1037, 687 P.2d 380, 387 (1983)("We see no reason why the civil liability of a law enforcement officer should not be coextensive with his or her criminal liability.").  In light of this statute and the courts' earlier determination that the defendants acted reasonably in using deadly force under the circumstances, the court concludes that the defendants were privileged in their use of force against Mr. Fry and therefore are not liable for a wrongful death cause of action premised on battery. *See id.* ("As we view K.S.A. 21-3215(1) . . . [i]t allows a law enforcement officer to use any force he or she believes necessary to effect an arrest, but prohibits the use of force which is likely to cause death or great bodily harm except to prevent death or great bodily harm to the officer or another person . . . .").

2.     Wrongful Death Premised on Negligence

The exceptions to the Kansas Tort Claims Act provide immunity to governmental entities or employees in certain situations.  K.S.A. § 75-6104.  The discretionary function exception provides immunity from liability for "any claim based upon the exercise or performance or the

failure to exercise or perform a discretionary function or duty on the part of a governmental entity or employee, whether or not the discretion is abused and regardless of the level of discretion involved." K.S.A. § 75-6104(e). Courts construing this discretionary function exception and its common law source have generally held that a law enforcement officer who uses an unreasonable amount of force or acts maliciously or wantonly will not be protected by the exception. *Hopkins v. State*, 237 Kan. 601, 611, 702 P.2d 311, 319 (1985); *Dauffenbach*, 233 Kan. at 385-86, 667 P.2d at 386; *Bradford v. Mahan*, 219 Kan. 450, 454, 548 P.2d 1223, 1228 (1976). *See also Robertson v. City of Topeka*, 231 Kan. 358, 364, 644 P.2d 458, 463 (1982)(Fromme, J., dissenting)(stating that in passing the Kansas Tort Claims Act, the legislature had no intention of changing the common law immunity for police officers). Accordingly, if an officer does not act unreasonably, they are entitled to the immunity provided by the Act. *See Dauffenbach*, 233 Kan. at 1034, 667 P.2d at 386 (stating that an officer generally has the right to use reasonable force).

Because the court has already found the defendants acted reasonably in this situation, it concludes they are entitled to immunity under the discretionary function exception if their actions were in fact discretionary and thus covered by the exception. In *Sevier v. City of Lawrence*, the Tenth Circuit granted the defendants' summary judgment motion regarding the plaintiffs' wrongful death claim premised on negligence, finding the defendants were entitled to immunity under the discretionary function exception in § 75-6104(e). 853 F. Supp. 1360, 1370 (10th Cir. 1994). The court held that the discretionary function exception applied in that

case because there was no clearly defined policy governing the officer's actions.  *Id.*  In this case, Ms. Fry has put forth no evidence indicating the existence of a clearly defined policy governing the defendants' actions under the circumstances.  Nothing in the record indicates a mandatory policy governing the defendants' actions leading up to the use of force.  Moreover, defendants' deadly force policy submitted by Ms. Fry states that "discretion to use a firearm rests with the officer."  Accordingly, the court finds that the defendants actions were discretionary with regard to the events in this case.  *Sevier*, 853 F. Supp. at 1370.  Therefore, the defendants are entitled to immunity under K.S.A. § 75-6104(e)  against Ms. Fry's wrongful death action premised on negligence.

**IT IS ORDERED BY THE COURT THAT** defendants' motions for summary judgment (Doc. # 66 and Doc. # 68) are granted.

**IT IS SO ORDERED.**

Dated this 12th  day of September, 2006, at Kansas City, Kansas.

s/ John W. Lungstrum
John W. Lungstrum

United Stated District Judge